IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN R. KEFFER,                         )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )   CIVIL ACTION NO. 11-00596-N
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
          Defendant.                    )

ORDER

Plaintiff John R. Keffer ("Keffer") filed this action seeking judicial review of a

final decision of the Commissioner of Social Security ("Commissioner") that he was not

entitled to Supplemental Security Income ("SSI") under Titles XVI of the Social Security

Act (the Act), 42 U.S.C. §§ 1381-1383c.[1]  Pursuant to the consent of the parties (doc. 19),

this action has been referred to the undersigned Magistrate Judge to conduct all

proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and

Fed.R.Civ.P. 73.  *See* Doc. 20.  The parties' joint motion to waive oral arguments (doc.

18) was granted on September 21, 2012 (doc. 21).  Upon consideration of the

administrative record (doc. 12) and the parties' respective briefs (docs. 13,16), the

undersigned concludes that the decision of the Commissioner is due to be **AFFIRMED**.

---

[1] All references to the U.S.C. (United States Code) are to the 2006 edition.

I.      Procedural History.

On January 15, 2009, Keffer filed an application for SSI benefits, alleging disability since May 19, 1988 (Tr. 107)[2] due to problems with his back and right arm and leg. (Tr. 152).  The application was denied on March 23, 2009 (Tr. 57-59).  Keffer timely requested a hearing before an Administrative Law Judge ("ALJ") on March 27, 2009.[3] (Tr. 65-66).  Following a hearing on April 20, 2010 (Tr. 29-55), the ALJ entered an unfavorable decision on May 4, 2010 (Tr. 18-28).  The Appeals Council denied review of the ALJ's decision on August 22, 2010 (Tr. 1-5), making the ALJ's decision the final administrative decision for purposes of judicial review.  *See* 20 C.F.R. §§ 404.981, 416.1481.

II.     Issues on Appeal.

1.      Whether the ALJ's residual functional capacity assessment is supported by substantial evidence?

2.      Whether the ALJ committed reversible error by failing to order a consultative orthopedic examination?

III.    Standard of Review.

        A.      Scope of Judicial Review.

_____

[2] SSI payments may not begin earlier than the month after the month of initial eligibility, which includes the month a claimant's application was filed. See 42 U.S.C. § 1382(d); 20 C.F.R. §§ 416.335, 416.501. All references to the C.F.R. (Code of Federal Regulations) are to the 2011 edition.

[3] The Commissioner processed Plaintiff's application pursuant to 20 C.F.R. § 416.1406(b)(4), whereby after the initial determination, the reconsideration step in the administrative review process is eliminated and the claimant can immediately request a hearing.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400; Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  *See also*, Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[ ]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d

227, 230 (11th Cir. 1991).

        B.     Statutory and Regulatory Framework.

      The Social Security Act's general disability insurance benefits program ("DIB")

provides income to individuals who are forced into involuntary, premature retirement,

provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. §

423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate

and distinct program. SSI is a general public assistance measure providing an additional

resource to the aged, blind, and disabled to assure that their income does not fall below

the poverty line. Eligibility for SSI is based upon proof of indigence and disability. See

42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate

programs, the law and regulations governing a claim for DIB and a claim for SSI are

identical; therefore, claims for DIB and SSI are treated identically for the purpose of

determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n.

1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the

meaning of the Social Security Act, which defines disability in virtually identical

language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20

C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the

person is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[4]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

---

[4] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id*. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id*. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"),or hear testimony from a vocational expert (VE). *Id*. at 1239–40.

IV.    Relevant Facts.

1.    Keffer's vocational background.

Keffer was born on February 16, 1962. (Tr. 36).  He was 48 years old on May 4, 2010, when the ALJ issued her unfavorable decision (Tr. 25, 36).  He did not complete the 6th grade and does not have a GED (Tr. 37).  He last worked in 1992 (Tr. 38).[5]

---

[5] Keffer worked as a truck driver for less than six months in 1992, his only reported employment. (Tr. 138, 38).  This job was subsequently describe as a "bookkeeper" who sat behind a desk and, when the trucks came in, would "put down how much went on the truck and how much we were paid per load." (Tr. 153).

He was convicted of "[p]ossession of a controlled substance [Methamphetamine]" and served time in prison from 2004 to January, 2009 (Tr. 37).  He is now serving a term on probation until 2014 (Tr. 38).

    2.   Medical Evidence.

On December 19, 1985, Keffer was involved in a motor vehicle accident ("MVA"). (Tr. 208).  The resulting compression fracture of the lumbar spine was surgically treated "by Harrington rods and grafts."  (Tr. 208, 209).   Post-operative medical treatment notes indicate that Keffer also injured his right shoulder in the 1985 MVA.  (Tr. 208, 209).  A note entered by Dr. Guy L. Rutledge, III, of The Orthopaedic Group PC, on May 5, 1986, indicates:

> X-rays show the rods in good position.  [Keffer] is now ambulating in his brace with mild assistance and overall this represents a remarkable improvement.  His fusion mass is maturing and I think we will just give this some more time.  He should return in two months for oblique x-rays.  With regard to the right shoulder he now shows active abduction to about 45 to 50°.  I have asked that he begin some gentle resistance exercises with this and we will follow this at the same time.

(Tr. 208).  At his September 18, 1986 office visit to The Orthopaedic Group PC, Keffer reported that he fell in the shower the preceding day "sustaining reinjury to the shoulder and . . . some discomfort in the back" but x-rays taken revealed "no change."  (Tr. 207).  Keffer did not show for appointments scheduled on Sept 24, October 22 and November 13, 1986.  (Tr. 207).  He did, however, return on November 17, 1986, when it was noted that he "is comfortable" and "making progress with [his right shoulder]."  (Tr. 207).  Keffer presented again to Dr. Rutledge on January 8, 1987, who entered the following note:

> Right shoulder active range still only 80° combined and this is probably going to be his permanent result.  His passive range is somewhat better.  He is still having some intermittent aching in the lower back but overall is getting along satisfactorily.  I have refilled Parafon and Tylenol #3.  We should see him in 6 weeks for oblique x-rays of the back.

(Tr. 205).

Keffer did not return to The Orthopaedic Group PC until June 21, 1996.[6]  At this visit, Keffer reported that he had been doing well until the last two and one-half months when he noticed an onset of pain in his back as well as a knot that he believed was becoming more prominent.  (Tr. 205).  On examination he was noted to have pain on flexion or extension, tenderness at the area of the knot, and that "hyperextension is quite uncomfortable."  (Tr. 205).  X-rays taken of his back revealed that "the Harrington rods have sustained fatigue fractures in the mid-portion" but that "His fusion mass looks intact."  (Tr. 206).  On June 24, 1996, Dr. Rutledge referred Keffer to Dr. J. West, who examined him on July 8, 1996, and reported that "he is going to require rod removal, exploration of fusion mass and possible re-instrumentation."  (Tr. 206).  On August 22, 1996, Keffer returned to Dr. West and requested the surgery to remove the rods.  (Tr. 204).  According to these medical records, Keffer underwent this surgery on or about September 7, 1996.  (Tr. 204).[7]  Keffer "showed up in the office" on September 16, 1996, and was reported "doing well" in that he "is fully ambulatory and feeling better."  (Tr.

---

[6] According to the records, Keffer did not show for the following appointments for which he was scheduled:  February 18, March 18, March 25, March 26, and April 2, 1987.  (Tr. 205).

[7] Medical treatment notes mention that Keffer was given Talacen # 30 on September 9, 1996, that this was his second post-op check, and that he was "doing very well."  (Tr. 204).

8

204).  He was directed[8] to "gradually increase his activity" and to "see Dr. West in two

weeks."  (Tr. 204).

      Keffer did not return, however, to the doctor's office until June 6, 1997, when he

reported that he "[f]ell out of shower 2 days ago when tripped."  (Tr. 204).  Although

Keffer complained "intensively of pain on bending," he was observed to be free of any

spasm, able to get up on his toes and heals, tender throughout his scarred area over the

superior gluteal nerve on the right, and experiencing "some diminished reflexes, but they

are equal bilaterally."  (Tr. 204).  Keffer was diagnosed with a "sprain superimposed on

his previous back" for which he was prescribed "Talicen" and instructed[9] to "work on

flexion exercises."  (Tr. 204).  Keffer was also instructed to "see Dr. West next week."

(Tr. 204).  There is no evidence in the record that Keffer ever returned to Dr. West or

complied with the instructions regarding the flexion exercises.[10]

      At the request of the state agency, Keffer was examined by R. Eugene Bass, M.D.,

an Orthopedist, on February 28, 2009.  (Tr. 213).  Dr. Bass reviewed Keffer's medical

records and noted his history of "fracture/dislocation of the lumbar spine in 1985

['secondary to a motor vehicle accident'] which was treated by Harrington rods and

grafts."  (Tr. 209).  Dr. Bass also noted that subsequently "there were fractures of the

---

[8] The author of this office visit note is identified only as "RJR."  (Tr. 204).

[9] This note was also entered by "RJR."  (Tr. 204).

[10] When asked whether he did anything like exercises to strengthen his back muscles, Keffer said "[t]he best thing that I have found when it gets real bad that I can actually do is I have to lay on hard stuff that's like a floor on my stomach for 10 to 15 minutes."  (Tr. 40).

rods" and they were removed.  (Tr. 209).  Keffer complained to Dr. Bass about "chronic low back pain that varies in severity," "occasional pain radiating into the right leg" and "some pain and limitation of motion of the right shoulder."  (Tr. 209).  Keffer also reported to Dr. Bass that he is restricted to lifting no more than 10 pounds, has to be careful with any bending or lifting, generally has to sit leaning to the left, has increased pain if he stands or walks for more than an hour, and, with respect to his shoulder, "does okay as long as he does not put any strain on the shoulder."  (Tr. 209).  He told Dr. Bass that he underwent two shoulder surgeries for repair of a torn rotator cuff.  (Tr. 209).

X-rays taken in conjunction with Dr. Bass's examination revealed "extensive post op changes in the lumbar spine [and] deformity of the L2 vertebrae with heterogeneous sclerosis of the vertebral body."  (Tr. 212).  The radiologist opined that "[t]his may be post traumatic but also could be secondary to osteomyelitis." (Tr. 212).  He recommended a comparison with prior x-rays, which showed "advanced disc space narrowing at L1-2 and L2-3," the "ossification of the facet joints throughout the lumbar vertebrae" as well as "accentuated lordosis of the L4-5 disc level with approximately 1 cm of retrolisthesis of L4 and L5."  (Tr. 212).

On his examination, Dr. Bass found that Keffer had a normal gait, normal examination of the neck and upper extremities except for the right shoulder. (Tr. 209). Dr. Bass found that Keffer's right shoulder had a well-healed surgical scar but flexion was limited to 90°,  abduction was limited to 70°, internal rotation was limited to 90°, and external rotation was limited to 30°.  (Tr. 209). Keffer also had pain on motion, but only minimal tenderness. (Tr. 209).  He had 4/5 strength in his right shoulder. (Tr. 209).  Dr.

Bass's examination of Keffer's back revealed that he could stand erect.  (Tr. 210).  Dr.

Bass also reported that Keffer had well-healed surgical scars in the left abdominal and

flank region and in the thoracic and lumbar spine regions, as well as a scar over the left

posterior iliac crest and SI joint region.  (Tr. 210).   Dr. Bass found that Keffer

experienced increased pain with motion, but only minimal tenderness and no spasms. (Tr.

210).  He further reported that Keffer was able to get onto the examination table without

assistance and that the remainder of a lower extremity examination was essentially

unremarkable.  (Tr. 210).

Neurologically, Keffer was found to have 4/5 strength in his right shoulder, but

otherwise 5/5 strength in both upper extremities.  (Tr. 210).  He had 5/5 foot and

ankle strength, could heel and toe walk, and was able to squat and rise again.  (Tr. 210).

He had some measurable atrophy in his thighs and calves, but intact lower extremity

sensation and no radicular pain with straight leg raising. (Tr. 210).

Dr. Bass summarized Keffer's status as:

1.      [P]ost residuals of fracture/dislocation of the lumbar spine. Post
operative Harrington rod instrumentation and fusion of the spine.
Post operative removal of the fractured Harrington rods.
Retrolisthesis of L4 and L5 with disc space narrowing.

2.      Post operative rotator cuff repair of the right shoulder x 2 with
residual limitation of motion.

(Tr. 209-12).  Although Dr. Bass reported his observations about Keffer's physical

abilities, he offered no other opinion.

On May 12, 2009, Keffer presented to Kenneth Sherman, M.D., with complaints

of "problems with back," "bad nerves," inability to sleep, new onset migraine headache,

and a mole on his arm.  (Tr. 225).  Dr. Sherman reported Keffer's back pain to be "localized to one or more joints."  (Tr. 227).  Keffer described his headache as being "on both sides" and "worst I ever had."  (Tr. 227).   In general, Keffer was noted as "[n]ot feeling tired or poorly," not having a fever and being in "no acute distress."  (Tr. 227, 228).   Keffer's pain was reported as 8 on a scale of 0-10.  (Tr. 228).   On his examination, Dr. Sherman found that Keffer had abnormal right shoulder range of motion. He also was found to have tenderness to palpation and spasms in the paraspinous muscles of his thoracic spine, tenderness to palpation of his thoracolumbar spine with abnormal flexion, extension, and rotation, and thoracolumbar spine pain with motion, but normal sensation, motor functioning, coordination, and reflexes.  (Tr. 228).  Dr. Sherman also noted "lesions" on the left forearm which he assessed as being "Lichen."  (Tr. 228-29).[11]  Dr. Sherman's assessment also included "[b]ackache and "[m]igraine headache."  (Tr. 229).  Dr. Sherman's plan included instructions to return for re-examination in 1-2 weeks, and prescriptions for Amitriptyline (an antidepressant) once a day at bedtime, Flexeril (a muscle relaxant) two times a day, Maxalt-MLT once as needed for migraine headache (may repeat in two hours if response is unsatisfactory).  (Tr. 229).

On May 19, 2009, Keffer returned to Dr. Sherman for the removal of an "irregular mole on his left forearm."  (Tr. 223).  The stitches from that procedure were removed by Dr. Sherman on May 26, 2009.

---

[11] Lichen planus is a chronic recurrent rash that is due to inflammation. Dr. Sherman later removed a mole from Keffer's left forearm, which he assessed to be a "non-neoplastic nevus." (Tr. 223). The record contains no further mention of any "lesions" or "Lichen."

3.    Keffer's Testimony.

Keffer completed a "Function Report" on January 24, 2009, and therein stated that he had no problems with his personal needs, including dressing, bathing, shaving, taking care of his hair, feeding himself and using the toilet. (Tr. 164).  He also stated he can shop, prepare simple meals, sweep, do his own laundry, and wash dishes when he cooks. (Tr. 165).  He also indicated that he could pay bills, count change, handle a savings account, and use a checkbook and money orders. (Tr. 166).  Keffer described his typical day as getting up about 7:00 am, eating, watching some television or reading for awhile; if it's nice outside, he will sit outside and watch the birds; he might take a nap but "most of the time I read or watch TV until I go to bed at night."  (Tr. 163).  He goes outside "just about every day" and goes shopping about once a week for maybe an hour or more. (Tr. 166).   He does not drive because he has no car so he is either driven by someone else or takes public transportation. (Tr. 166).  Keffer lists his hobbies and activities as reading, watching television, sitting in the yard watching birds, and playing cards with friends. (Tr. 167).  Keffer described his limitations as not being able to reach over his head (Tr. 162), lift more than ten pounds, having trouble bending, and experiencing pain in his back and right leg if he stood for too long (Tr. 168).  He said he could walk for maybe a half mile before needing to stop and rest for ten minutes or so. (Tr. 168).

At an administrative hearing held on April 20, 2010, Keffer testified that he was convicted of possession of methamphetamine in 2004 and served a prison sentence from 2004 to 2009 (Tr. 37).  He is presently on probation until 2014 (Tr. 37-38).  Keffer

testified that while he was imprisoned he took 600 mg of Motrin three times a day, but occasionally went without any medication for one and a half to two months when his prescription ran out and he had to wait to get on the roster to see the doctor again.  (Tr. 52-53).

Keffer testified he that does not use a back brace, cane, or crutches (Tr. 36-37). The only medicine Keffer presently takes is two "Goody's powders" three times a day, when he gets up in the morning, around 11:30/12:00 noon, and 5:00 to 6:00 p.m. (Tr. 39). He started having migraine headaches and said he could not afford the medicine prescribed for them, but that the Goody's powders helps "a little bit." (Tr. 39).  Keffer also testified that he has not returned to the doctor because he has not had the $10.00 needed to go back. (Tr. 38).   In response to the ALJ's question about whether he did any exercises to strengthen the muscles in his back, Keffer testified that the best thing he found to do when the pain got bad is to lie on his stomach on a hard surface like the floor for ten to fifteen minutes. (Tr. 40).  He further stated that he usually did this only when he strained himself or turned the wrong way.  (Tr. 40).  Keffer stated that he did not know how far he could walk but that he walks around WalMart for "maybe ten minutes or so" and then a little more after resting a few minutes.  (Tr. 40).  He can stand ten to fifteen minutes at a time but then feels a strain on his hips.  (Tr.  40-41).  The only restriction Keffer testified to in relation to sitting was the need to support most of his upper body weight on his arms.  (Tr. 41).   He has a ten pound weight limit and is careful to avoid slipping or falling down. (Tr. 41).  He has difficulty with stairs and must go up them one at a time and, if he goes up more than one flight of stairs, his left leg gets weak.  (Tr. 41).

14

Keffer also testified that he took care of the 22 foot trailer he lives in, did his own laundry, and fixed his own meals, consisting on mainly sandwiches, canned chili and "cheap stuff from Dollar General." (Tr. 42). Keffer stated that most of the time he read, watched television, or sat outside in his chair watching the birds. (Tr. 42).

Keffer testified that he has been clean and sober for six years and promised his son and daughter he would remain so. (Tr. 43). He further testified that, because he is a drug addict, "I can't be doing drugs no matter whether I can get them legally or not because the chances are that I'll take it too far so . . . I really don't want nothing for my back other than what I'm doing now because I don't want to take a chance." (Tr. 44).[12]

    4.   Vocational Expert's Testimony.

The ALJ presented a hypothetical to Sue N. Berthaume, a vocational expert, which included an individual of Keffer's age, education, and lack of any past work experience who was limited in the following fashion:

> Lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, need a sit, stand alternatively, no overhead reaching, no climbing stairs, ladders, scaffolds, or ropes and no operation of foot controls, no unprotected heights or dangerous equipment, no more than occasional bending, stooping, kneeling, crouching, and crawling or climbing stairs and ramps, only short simple instructions, and one and two step job instructions.

(Tr. 46). Asked by the ALJ whether there are any jobs such a hypothetical individual could perform, Ms. Berthaume stated:

> Yes, ma'am, there'd be jobs of production assembler. That is light and unskilled.

---

[12] Keffer further testified that he had been "strung out on Lortabs . . . and Oxycontin before because of the doctor giving them to me [a]nd it led to other things. And I've seen what it's done to me and I just, I'm not going to do that no more." (Tr. 44).

In the national economy there's approximately 333,000, and at the state, approximately 15,000.  There's also jobs such as microfilm document preparer.  That is sedentary and unskilled.  And in the national economy, there's approximately 176,000, and in the state, approximately 20,000.  There's also jobs such as surveillance system monitor which is classified as sedentary and unskilled.  In the national economy, there's approximately 143,000 and in the state, approximately 2800.

(Tr. 46).  Ms. Berthaume testified that the sit/stand option is consistent with the DOT (Tr.

47).  The ALJ then proposed another hypothetical limited in the following fashion :

Limited to lifting and carrying no more than 10 pounds, need a sit, standing and walking about 2 hours in an 8 hour work day, sitting about 6 hours in an 8 hour work day, no more than occasional climbing, stooping, kneeling, crouching, and crawling, and frequently bending.  No climbing stairs, ladders, or scaffolds, or ropes.  No overhead reaching.  No work around unprotected heights or dangerous equipment.

(Tr. 47).  The ALJ then inquired whether, with these restrictions, there would be jobs

available for "an individual who has a marginal education as a younger worker… ", to

which Ms. Berthaume testified:

Yes, ma'am.  Could still do the surveillance system monitor position.  There's also a job such as call out operator, which is a sedentary and unskilled job.  And in the national economy, there's approximately 48,000, and in the state, approximately 2970.  There's also sedentary assembler positions that would be unskilled. And in the national economy, there's approximately 102,000 and in the state, approximately 1500.

(Tr. 47).

Keffer's counsel asked which of those jobs would still be available if the

individual with the sit/stand option had to change positions every 15 minutes while

remaining at the work station.  (Tr. 48-49).  Ms. Berthaume testified that the individual

would still be able to do the surveillance system monitor job.  (Tr. 49).  Ms. Berthaume

was then asked which jobs would be available if the individual could sit and stand for one

hour at a time. (Tr. 49). She responded that such an individual "could do all three jobs." (Tr. 50).

       5.   <u>ALJ's Decision</u>.

The ALJ followed the five-step sequential evaluation mandated by the regulations for determining disability. *See* 20 C.F.R. § 416.971 *et seq.* At step one, the ALJ found that Keffer had not engaged in substantial gainful activity since his application date of January 15, 2009. (Tr. 20). At step two, the ALJ found that, within the meaning of 20 C.F.R. § 416.920(c), Keffer had severe impairments of degenerative disc disease of the thoracic and lumbar spine and history of right rotator cuff tear and repair. (Tr. 20).[13] At step three, the ALJ found that Keffer did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 20).[14] The ALJ concluded that Keffer had the residual functional capacity to perform less than a full range of sedentary work as defined by 20 C.F.R. § 416.967(a), which included the following limitations:

> He is unable to reach overhead. He cannot climb ladders, scaffold, or ropes. He is unable to work around unprotected heights or dangerous equipments. He is limited to no more than frequent bending and no more than occasional stooping, kneeling, crouching, and crawling.

---

[13] The ALJ rejected any contention that Keffer's complaint of migraines constituted severe impairments on the grounds that he was prescribed medication which was apparently effective because he has not required any further treatment and did not complain of migraine headaches at the consultative examination with Dr. Bass. (Tr. 20, *citing* Exhibits 4F [Tr. 229] and 2F [Tr. 209-212]).

[14] The ALJ concluded that Keffer's degenerative disc disease did not meet Medical Listing 1.04 because it is "not characterized by nerve root compression, spinal arachnoiditis, or spinal stenosis." (Tr. 20). The ALJ also concluded that Keffer's history of right rotator cuff tear and repair does not meet Medical Listing 1.02 because it "does not prevent [him] from performing fine and gross movements. (Tr. 20-21).

(Tr. 21).

At step four, the ALJ noted that Keffer "has no past relevant work."  (Tr. 24).  At step five, the ALJ found, based upon the vocational expert's response to the ALJ's hypothetical questions, that Keffer could perform jobs existing in significant numbers in the national economy, including the jobs of surveillance system monitor (143,000 jobs in national economy and 2,800 jobs in the regional economy), call out operator (48,000 jobs in national economy and 970 jobs in the regional economy) , and sedentary assembler (102,000 jobs in national economy and 1,500 jobs in the regional economy).  (Tr. 25). The ALJ thus found that Keffer was not disabled (Tr. 25).

V.    Analysis.

**(1)  The ALJ's residual functional capacity assessment is supported by substantial evidence.**

Keffer argues that "the record is devoid of any medical opinions regarding the Plaintiff's RFC" and "the ALJ's statement regarding Plaintiff's treating physician's opinion refers to an overall absence of medical opinion in the record, not an affirmative statement by any doctor that the Plaintiff does not have any physical restrictions."  (Doc. 13 at 4).   Keffer also argues that "[t]he only restrictions found in the file were given by Single Decision Maker Phillip W. Lambert."  (*Id., citing* Tr. 214-221).   Keffer therefore contends that there is no specific medical opinion supporting the ALJ's RFC determination, and as such, the ALJ's RFC finding is not supported by the requisite substantial evidence. (*Id.*).  Keffer relies, in part, upon Foxx v. Atrue, 2009 WL 2899048, *7 (S.D. Ala. Sept. 3, 2009)(" The [single decision maker's (S.D.M.'s)] assessment does

not constitute substantial evidence [and] . . . 'a finding from such an individual is entitled to no weight as a medical opinion, or to consideration as evidence from other non-medical sources'."), *quoting* Bolton v. Astrue, 2008 WL 2038513, *4 (M.D. Fla. May 12, 2008).

The Commissioner argues, in sum, that a determination regarding residual functioning capacity is an assessment to be made solely by the ALJ, although it must be based upon all of the relevant evidence concerning a claimant's ability to work despite his impairments.  (Doc. 16 at 10).  The Commissioner specifically contends that:

> The agency's regulations and rulings make clear that it is the ALJ's responsibility, not the responsibility of a physician, to assess a claimant's residual functional capacity. See 20 C.F.R. § 416.946(b) (at the hearing level of the administrative process, the ALJ is responsible for assessing a claimant's residual functional capacity); SSR 96-5p, 1996 WL 374183, at *2 (same). The determination of a claimant's residual functional capacity may often be "dispositive" of the claimant's disability status. See 20 C.F.R. § 416.927(e)(2); SSR 96-8p, 1996 WL 374183, at *2. For that reason, residual functional capacity assessments "must be based on all relevant evidence in the record," not just the medical evidence. See SSR 96-5p, 1996 WL 374184, at *5 (emphasis added); 20 C.F.R. § 416.945(a). Hence, no doctor's opinion or testimony is alone conclusive on this issue. SSR 96-2p, 1996 WL 374183, at *2 ("some issues [such as residual functional capacity assessments] are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case" and "the regulations provide that the final responsibility for deciding issues such as these are reserved to the Commissioner").

(*Id.*).  The Commissioner also disputes Keffer's contention that the ALJ relied solely on the decision of a non-medical single decision maker because, *inter alia*, "[n]owhere in her decision does the ALJ even mention the opinion of the single decision maker."  (*Id.* at 9).  The Commissioner contends that the ALJ committed no error because she "based

her residual functional capacity finding on substantial evidence in the record as a whole. (*Id.* at 7).

The authority of an ALJ to make a determination about residual functional capacity, based upon all the relevant evidence of a claimant's remaining ability to do work despite his impairments, has been recognized by the Eleventh Circuit. *See*, Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004 )(the ALJ will "assess and make a finding about the [claimant's] residual functional capacity based on all the relevant medical and other evidence" and "the ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."), *quoting/citing* 20 C.F.R. § 416.920(e).[15] *See also*, Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996)(activities and conservative medical treatment support ALJ's decision to discredit testimony regarding nonexertional impairments); Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984)(in addition to objective medical evidence it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing);  Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984) (Upheld the ALJ's finding that "[t]he essentially benign objective medical record, lack of regular use of potent pain medicatinn [sic], description of daily activities as well as claimant's demeanor and testimony at the hearing mitigate [sic] against claimant's allegation of constant, severe pain."); Cartwright v. Heckler, 735 F.2d 1289, 1290 (11th

---

[15] Phillips was reversed on other grounds, namely the ALJ's failure to address an issue concerning whether the claimant's nonexertional limitations significantly limit her basic work skills at the sedentary work level, an issue which had to be resolved before the ALJ could rely on the grids to determine whether other jobs exist in the national economy that a claimant is able to perform.  357 F.3d at 1242-44.

Cir. 1984)(ALJ's decision was supported, *inter* alia, by the fact that "[n]o doctor

indicated that the claimant was permanently disabled.").  In Carson v. Commissioner of

Social Sec., 440 Fed.Appx. 863, 864 (11th Cir. Sept. 21, 2011), the ALJ's RFC

determination that the claimant could "perform a limited range of light work" was upheld

because "the ALJ fully discussed and evaluated the medical evidence, Mr. Carson's

testimony, and the effect each impairment has on his daily activities."  The Eleventh

Circuit also held that:

> While, the ALJ did not specifically refer to Mr. Carson's ability to walk or
> stand, the ALJ did limit Mr. Carson's exertional level of work to "light
> work." "Light work" by definition limits the amount an individual can walk
> or stand for approximately six hours in an eight-hour work day. *See* SSR
> 83–10, 1983 WL 31251 (S.S.A.). Furthermore, the ALJ's thorough
> evaluation of Mr. Carson's case led the ALJ to adopt additional limitations
> to Mr. Carson's ability to perform light work. Simply because the ALJ
> chose not to adopt further limitations on Mr. Carson's ability to walk or
> stand, does not mean the ALJ did not properly consider the alleged
> limitations. Furthermore, there is substantial evidence that Mr. Carson is
> not fully disabled in regards to walking or standing because ***none of the
> doctors that evaluated Mr. Carson noted any concerns with his ability to
> stand or walk***, other than what Mr. Carson complained of to them. On the
> contrary, Mr. Carson's treating physician, Dr. Lord, only put limitations on
> Mr. Carson's ability to use his left shoulder. Tr. at 13 Furthermore, Dr.
> Tran, who examined Mr. Carson for the Commissioner, noted that Mr.
> Carson's ***gait was normal*** and that he was ***able to enter and exit the
> examining table without difficult***. Id. at 291. As such, the ALJ could
> properly decide that Mr. Carson could walk or stand for approximately six
> hours in an eight-hour work day.

391 Fed. Appx. at 864 (emphasis added).  In Carson, the Eleventh Circuit approved an

RFC which was based upon the ALJ's "extensive review of the medical and non-medical

evidence."  (*Id.*).  Likewise, in the case at hand, the ALJ determined Keffer's RFC only

after an extensive review of the medical and non-medical evidence in this record.

This Court and others within the Eleventh Circuit have also held that there is no requirement that the ALJ's finding be based on the residual functional capacity assessment of a treating or examining physician in every case. Thomas v. Astrue,  2012 WL 1145211, *7 (S.D. Ala. Apr. 5, 2012)("an ALJ's [residual functional capacity] assessment may be supported by substantial evidence even in the absence of an opinion by an examining medical source about a claimant's residual functional capacity"); Griffin v. Astrue, 2008 WL 4417228, *10 (S.D. Ala. Sept. 23, 2008)( Rejecting Plaintiff's argument that a physician's RFC assessment was required and holding that plaintiff "has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect."); Williams v. Astrue, 2009 WL 413541, *5 (M.D. Fla. Feb. 18, 2009)("[T[he [ALJ], as the factfinder, does not need an opinion from a treating or examining doctor concerning a claimant's functional limitation[s] in order to make a finding regarding a claimant's RFC."); Cooper v. Astrue, 2009 WL 537148, *7 (M.D. Ga. Mar. 3, 2009)( "[A]n ALJ is not required to order additional consultative examinations if he does not find them necessary to make an informed decision" [and] "This Court declines . . . to read into every case a requirement that the ALJ obtain a residual functional capacity assessment from a treating or examining physician.").

Contrary to Kerry's contention, the ALJ in this case, unlike the ALJ in Foxx, *supra*, did not expressly adopt or assess any weight to the restrictions enumerated by Phillip W. Lambert, a non-medical source Single Decision Maker ("SDM").  The fact that the ALJ's RFC determination appears to mirror the restrictions set forth in Mr.

Lambert's report would only be relevant if the ALJ's RFC determination was not otherwise supported by substantial evidence in the record.

In addition to the fact that no treating or examining physician has imposed any restrictions on Keffer's activities and that Keffer neither sought medical treatment from 1997 until 2009 nor returned for treatment since May 26, 2009, the ALJ in this case also relied on the following observations of Dr. R. Eugene Bass, a consultative examining physician:

> On examination, the claimant walked with a normal gait pattern (Exhibit 2F [Tr. 209-10]).  Flexion of the right shoulder was limited to 90 degrees, abduction to 70 degrees, and external rotation to 30 degrees.  There was increased pain on motion and minimal tenderness noted.  Strength was 4/5 in the right shoulder.  Examination of the neck and upper extremities was otherwise unremarkable.  Examination of the back revealed that he is able to stand erect.  No spasm was noted.  Minimal tenderness was presented.  He demonstrated 60 degrees of flexion and 15 degrees of extension.  He had increased pain with motion.  He was able to get onto the examination table without assistance.  Examination of the lower extremities was essentially unremarkable.  He had 4/5 strength in the right shoulder.  Otherwise he had 5/5 strength in both upper extremities Strength of the foot and ankle flexors and extensors was 5/5 bilaterally.  He was able to heel toe walk and was able to squat and rise.

(Tr. 22).  The ALJ further relied on Dr. Bass's finding that, despite his measurable atrophy of the right thigh and calf,[16] Keffer had intact sensation in the lower extremities and straight leg raising was "negative for radicular pain."  (Tr. 22; *see also* Tr.  210).  The ALJ also relied on the treatment notes of Dr. Kenneth Sherman in May 2009, which revealed that Keffer was in no acute distress and was not chronically ill.  (Tr. 21, 228).

---

[16] Keffer's examination revealed "[t]high measurements one hand breadth above the superior patellar border [were] 37 cm on the right and 42 cm on the left [and] [c]alf measurements [were] 36 cm on the right and 39 cm on the left."  (Tr. 210).

Dr. Sherman also reported Keffer's abnormal right shoulder range of motion, tenderness on palpation of his thoracolumbar spine with abnormal flexion, extension, and rotation, and thoracolumbar spine pain with motion, but found that Keffer's reflexes were normal and he had no neurological dysfunctions, including no coordination abnormalities, no sensory exam abnormalities, and no motor exam dysfunction.  (Tr. 21, 228).  Dr. Sherman prescribed a muscle relaxant, Flexeril, for Keffer's back pain.  (Tr. 21, 229).

The ALJ's RFC determination is also supported by Keffer's own written declarations and oral testimony.  Keffer's claim for disability is primarily based upon "pain resulting from his impairments."  (Tr. 22).   While the evidence of record supports Keffer's underlying medical condition, the ALJ correctly concluded that the record contains no objective medical evidence confirming the severity of the alleged pain.  (Tr. 23).  The ALJ relied on evidence that Keffer sought and received "very little treatment for his impairments" and "the treatment he has received has been routine and conservative."  (Tr. 23).  Keffer sought no treatment from 1997 until 2009, although he did obtain some prescriptions for Motrin, 600 mg. three times a day, while he was incarcerated from 2004 to 2009 (Tr. 52-53).[17] The ALJ also noted that, since his last visit to the Orthopaedic group, Keffer has failed to comply with instructions to do flexion

---

[17] Keffer testified that there were periods during his incarceration when his prescriptions ran out that he would go a month and a half to two months without any medications until he could get back in to see the prison doctor, who would always renew his prescription.  (Tr. 52-53).  Keffer did not allege that he received any other treatment from the prison doctor other than the Motrin prescriptions.

exercises to strengthen his back muscles.[18]  (Tr. 23, 40, 204).  The record also establishes that Keffer often failed to show up for scheduled doctor's appointments.  (Tr. 205).

Keffer's description of his daily activities and abilities also supports the ALJ's RFC determination.  Keffer reported that he had no problem with his personal needs, including dressing, bathing, shaving, taking care of his hair, feeding himself and using the toilet. (Tr. 164).  He also confirmed at his hearing that he shops, prepares simple meals for himself, sweeps, does his own laundry, and washes dishes when he cooks. (Tr. 42, 165).  Keffer further testified that he does not use a back brace, cane or crutches (Tr. 36-37) and the only medicine he takes is two "Goody's powders" three times a day, when he gets up in the morning, around 11:30/12:00 noon, and 5:00 to 6:00 p.m. (Tr. 39). Although he said he could not afford the medicine prescribed for his recent onset migraine headaches, he testified that the Goody's powders help "a little bit." (Tr. 39).

Keffer initially reported that his typical day begins at 7:00 a.m. when he gets up and then includes eating, watching television or reading, and, if the weather is nice, sitting outside and watching the birds.  (Tr. 163).  He also stated that he might take a nap but "most of the time I read or watch TV until I go to bed."  (Tr. 163).  Keffer described his limitations as not being able to reach over his head (Tr. 162), lift more than ten pounds, having trouble bending, and experiencing pain in his back and right leg if he stood for too long (Tr. 168).  He said he could walk for maybe a half mile before needing to stop and rest for ten minutes or so. (Tr. 168).

---

[18] *See* n. 10, *supra.*

Keffer's testimony at his hearing was not inconsistent with either his initial report of activities and abilities or the ALJ's RFC determination.  Keffer testified that he did not know how far he could walk but that he walks around WalMart for "maybe ten minutes or so" and then a little more after resting a few minutes.  (Tr. 40).  He can stand ten to fifteen minutes at a time.  (Tr. 40-41).  The only restriction Keffer testified to in relation to sitting was the need to support most of his upper body weight on his arms.  (Tr. 41).  He stated that he has a ten pound weight limit. (Tr. 41).  He has difficulty with stairs and must go up them one at a time and, if he goes up more than one flight of stairs, his left leg gets weak.  (Tr. 41).  Keffer confirmed that, in addition to taking care of his 22' trailer, doing his own laundry and fixing his own simple meals, he spends most of his time reading, watching TV or sitting in his chair in the yard watching the birds.  (Tr. 42).  As the ALJ properly concluded, "[Keffer's] daily activities and statements concerning his ability to lift, carry, sit, stand, and walk are not inconsistent with the above stated residual functional capacity," namely that Keffer could perform a limited range of sedentary work.  (Tr. 23-24).

The above evidence supports the ALJ's RFC in this case and is substantial considering the record as a whole.  Keffer has not demonstrated, nor does he even allege, that he has any further physical limitations than those in the ALJ's RFC.  *See* Dailey v. Astrue, 2012 WL 3206482, *9 (S.D. Ala. July 18, 2012)("an ALJ may reach an RFC determination in appropriate circumstances on a record that does not include an RFC opinion from a treating or examining medical source."), *citing* Griffin v. Astrue, 2008 WL 4417228, * 10 (S.D. Ala. Sept. 23, 2008)("While Plaintiff asserts that a physician's

26

RFC assessment was required, she has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect."). *See also* Ross v. Astrue, 2012 WL 3543324, *4 (M.D. Ala. August 16, 2012)(Held that "the physical limitations found by the ALJ meet or exceed the limitations claimed by Plaintiff or shown by Plaintiff's medical records [and] the ALJ's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about Plaintiff's functional capacity.").  In this case, Keffer has failed to demonstrate that he is unable to perform the sedentary work of a surveillance system monitor, particularly in light of his admission that he spends most of his day reading and watching TV or sitting in his yard watching the birds.

### (2)   The ALJ did not commit reversible error by failing to order a consultative orthopedic examination.

Keffer next argues that the ALJ erred in failing to order another consultative orthopedic examination that included a medical source statement of Keffer's residual functional capacity.  (Doc. 13 at 4-6).  Relying upon 20 C.F.R. § 404.1519, Keffer argues that such a consultative examination is necessary because "[t]here is no medical opinions in the file regarding Plaintiff's RFC." (Doc. 13 at 6).  For the reasons stated above, Keffer has failed to establish that the evidence in the record as a whole, both medical and non-medical, is insufficient to support the ALJ's RFC determination and decision on his claim.  *See*  20 C.F.R. § 416.919a(b).  *See also* Doughty v. Apfel, 245 F.3d 1274, 1281 ("the regulations normally require a consultative examination only when necessary

information is not in the record and cannot be obtained from the claimant's treating medical sources or other medical sources").  In this case, the report of Dr. Bass (Tr. 209-12) and the treatment notes of Dr. Sherman (Tr. 222-29), together with the documentary and testimonial evidence from Keffer, provided sufficient information to support the ALJ's finding that Keffer was not disabled.

Keffer also repeats his argument that "the only opinion in the record regarding the Plaintiff's RFC was completed by SDM Phillip Lambert" and, therefore, that the ALJ's RFC determination is not supported by substantial evidence. (Doc. 13 at 4, 6).  As demonstrated above, the ALJ's decision is in fact supported by the other substantial evidence in this record, both medical and non-medical.  Consequently, this argument is without merit.  Keffer has failed to establish that the ALJ erred when she refused to order another consultative examination.

CONCLUSION

For the reasons stated above, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's benefits be and is hereby **AFFIRMED.**   Judgment shall be entered accordingly.

**DONE** this __28th__   day of February, 2013.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**